## Miller Supply Company v. Limestone Mining Company.

(Decided June 19, 1914.)

### Appeal from Carter Circuit Court.

1. Principal and Agent—Authority of Agent—Warranty.—Where an. agent, who was the only representative in this State of his principal, a foreign corporation, sold to defendant a hydraulic pump, with full knowledge of all the conditions and circumstances under which the pump was to be used, and not only represented that the pump would do the work, but agreed to take the pump back if it was not satisfactory, it was within the scope of the agent's apparent authority to represent to the defendant that the pump

would do the work for which it was purchased, and defendant had a right to rely on the representations thus made.

2. Contracts—Validity—Signing Without Reading.—While ordinarily a party who can read and who signs a contract without reading it, will not be heard to complain that the provisions of the contract are not what he supposed they were, yet this rule does not apply when the party thus signing is misled by the other party or his agent, and for this reason fails to read the contract.

3. Contracts—Validity—Oral Contract of Sale—Provisions of Written Contract—Evidence.—Where plaintiff's agent sold to defendant a pump, and orally warranted to defendant's president that the pump would do satisfactory work, evidence examined, and held, that this provision of the contract of sale was omitted from the written contract by mistake on the part of the defendant, and either fraud or mistake on the part of the agent representing plaintiff.

JOHN W. WOODS for appellant.

ARMSTRONG & WOLFFORD for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Defendant, the Limestone Mining Company, was engaged in conducting a rock quarry in Carter County, Kentucky. On January 3, 1912, plaintiff, the Miller Supply Company, sold the defendant a Cameron pump, to be used in removing the soil from the rock, together with certain pipe to be used in connection therewith. This action was brought by plaintiff to recover the purchase price of the pump, amounting to $964.64, and a balance due for supplies, amounting to $167.44. The Limestone Mining Company defended on the ground that the pump was guaranteed to do the work for which it was purchased, and that by fraud or mistake this part of the agreement was omitted from the written contract. Defendant also pleaded that the contract of sale was rescinded. It also interposed a counterclaim for damages growing out of expenses incurred in setting up the pump. On final hearing the chancellor held that the pump did not come up to the guarantee made by plaintiff, that the contract of sale was rescinded, and that the defendant was damaged in the sum of $150. Thereupon the pump and fixtures were adjudged to be the property of plaintiff, and plaintiff's petition was dismissed. Defendant was given judgment on its counterclaim for the sum of $150. From that judgment plaintiff appeals.

It appears that defendant was engaged in quarrying limestone. To prepare the stone for market it was necessary to remove the soil. This was being done by the use of scrapers and shovels. Plaintiff's agent approached defendant for the purpose of selling it a hydraulic pump to be used in the removal of the soil. Defendant's officers had never seen such a pump in use. Defendant's president and plaintiff's agent went over the ground. They measured the distance from the boiler to the place where the pump was to be located, and the distance from the pump to where the power was to be applied. The pump was to be located at a point about 800 feet from the boiler, and about 800 feet from the place where the soil was to be removed, the soil being at an elevation of 200 feet above the pump. A pipe line connected the boiler with the pump, and also the pump with the place where the soil was located. A 100-horse power boiler was used. According to defendant's evidence, plaintiff's agent, after going over the ground and seeing where the boiler and the pump were located, and the power was to be applied, and after actually measuring the distance, guaranteed that the pump would remove the soil, and that if it did not do so, plaintiff would take the pump back. Under these conditions, the purchase was made. Along later in the evening plaintiff's agent drew up a writing which he presented to defendant's president for his signature. It was late in the evening and the light was not very good. Defendant's president objected to signing the written contract, whereupon plaintiff's agent stated that the contract was only a memorandum. Under these circumstances, defendant's president signed the contract. Defendant's president had previously bought several articles from plaintiff's agent, and at the time of the purchase of the pump he bought a drill for $850. After the pump was installed, it was a complete failure. Plaintiff's agent then came to the quarry and stated that the 2-inch pipe which had been furnished was too small. He then recommended that the 2-inch pipe be removed, and that a 3-inch pipe be used. Thereupon the 3-inch pipe was put in place of the 2-inch pipe. The work of the pump was then slightly better, but still failed to give satisfaction. Plaintiff's agent came back again, and stated that he would be as good as his word, and would take the pump back. He then left, promising to give shipping directions, but they were

never furnished. The defendant incurred an expenditure of about $150 in setting up and operating the pump. Peter Gearhart and H. W. Hillman, who were present when the sale was finally consummated, corroborate defendant's president. Several witnesses testified to the fact that the pump would not remove the soil.

For the plaintiff the contract of sale was introduced in evidence. In the contract the pump is described as an 18x9x20 A. S. Cameron horizontal pump, price $964.64. There is also in the contract a provision that the proposition is not a contract until signed by the Miller Supply Company at its home office, Huntington, West Virginia. The contract also contains the following provision:

"It is agreed and understood that all previous communications, written or verbal, are hereby withdrawn, and that no modification of this contract shall be binding on the parties hereto unless such modification be in writing and signed by each of the parties hereto, and that no agent or salesman has any authority to obligate the Miller supply Company by any terms, conditions or stipulations not herein expressed."

The contract in question contains no warranty of any kind. The agent testified that he guaranteed the pump, or rather the Miller Supply Company did. He says: "I corroborated it to give 150 lbs. on 200 ft. elevation with a 1½ or 1¾ nozzle." The only memorandum in writing of this guarantee was in the copy of the order that he took for the pump. This order, which is in evidence, and was not signed by defendant, contains the following: "All goods guaranteed as per conditions stated in letter of September 20, 1911." In this letter plaintiff quoted prices on two pumps, one a Fairbanks-Morse pump, and the other a Cameron pump. The letter states that the Fairbanks-Morse pump was built for a water pressure of 250 pounds per square inch, to work against a total head of 200 vertical feet with a nozzle pressure of 150 pounds, using a 1¾ or 2-inch nozzle. The price of this pump was $1,130. The letter also states that "the A. S. Cameron Steam Pump Works recommend for this work a little smaller pump, one that will work through a 1 to 1½ inch nozzle;" price $565. It is also stated in the letter that the difference in the price of the two pumps is due to their size. Plaintiff's agent stated that he made several trips to see defendant's

president in regard to the sale of the pump. He never represented that the contract was a mere memorandum, but told Mr. Carpenter, the president, that it would not be binding until approved by the Miller Supply Company. Never told Mr. Carpenter that the company would take back the pump if it would not do the work. His statement of what occurred is as follows:

"According to our agreement, according to our guarantee, if the pump would not do the work it would have to be disposed of somehow. I don't remember how, or why. Of course that would be the same as any kind of a guarantee, if I sold you for steel rail something that wasn't steel rail, I would have to furnish steel rail."

He meant by that that the pump would have to come up to the guarantee that he had made. The agent admitted that he knew where the boiler was located, and that he and Mr. Carpenter measured the distance from the boiler to where the pump was to be located, and also the distance from where the pump was to be located to the place where the power was to be applied. In figuring on the pipe he told Mr. Carpenter that a 2-inch pipe would work. On cross-examination witness stated that he had been selling machinery and supplies for the Miller Supply Company for a number of years, and had made frequent sales to Mr. Carpenter for the Limestone Mining Company. Made several trips for the purpose of selling the pump. When he made the sale he knew about where the boiler was to be located and the pump was to be located, and where the stripping was to be done. He also knew that the pump was for stripping purposes. His guarantee was that the pump would give a pressure of 250 pounds a square inch, and work against a total head of 200 verticle feet with a nozzle pressure of $150 pounds, using a 1¾ or 2-inch nozzle. After considerable evasion of the question as to whether or not he agreed on behalf of the company to take the pump back if it would not do the work, he finally admitted that if the pump did not have sufficient capacity to do the work designed "there would naturally have to be a larger pump furnished for the work." At first witness stated that he did not remember whether Mr. Carpenter read the contract or not, but subsequently stated that he did. He further stated that there was no defect in the pump. Several witnesses testified that the failure of the pump to work was due to its distance from the power and from

the place where the force was to be applied, instead of any defect in the pump.

Edward M. Coryell, a machinery expert in the employ of the A. S. Cameron Steam Pump Works, testified that if the pump was placed 800 feet from the boiler the pressure would be greatly diminished, and the pump would not work to its full capacity. Under the circumstances a 100-horse power engine would not be sufficient. He also stated that a pump with much greater capacity would be required to supply a 1½-inch nozzle at 150 pounds, not to speak of a 2-inch nozzle, and that the pump purchased by defendant was not sufficient for the purpose.

It is insisted by plaintiff that under the rule that parol evidence is inadmissible to vary or alter a written contract, except in cases of fraud or mistake, the evidence of fraud or mistake in this case is not sufficiently clear and convincing. It is further insisted that plaintiff's agent had no authority to make any guarantee other than that contained in the written contract.

The following facts clearly appear. They are not only testified to by Mr. Carpenter, but admitted by plaintiff's agent: Plaintiff's agent insisted on defendant's buying a hydraulic pump. Defendant's officers knew nothing about such a pump. They relied on plaintiff's agent. The agent knew the precise location of the engine, of the place where the pump was to be erected, and of the place where the stripping was to be done, also the power of the engine. He not only went over the ground, but actually measured the distance. In addition to this he sold the defendant the pipe to be used in conveying the steam from the boiler and the power from the pump. The parties actually figured on whether it would be cheaper to move the boiler or to buy the pipe. The agent admits that he made a guarantee in regard to the pressure, and also says that he may have made other guarantees. It is perfectly clear that the agent, with full knowledge of all the circumstances under which the pump was to be used, not only represented that the pump would do the work, but further agreed to take the pump back if it was not satisfactory. The corporation which the agent represented was located in West Virginia. So far as this record shows, he was the only person authorized to sell its pumps in this State, and had been engaged in the business for a number of years. Having the

power of sale, it was clearly within the scope of his apparent authority to represent to the defendant that the pump would do the work for which it was purchased. True, if the agent's warranty were confined to the power of the boiler, a different rule would apply; Lucile Mining Co. v. Fairbanks, Morse & Co., 27 Ky. L. R., 1100; J. M. Case Mill Mfg. Co. v. Vickers, 144 S. W., 76; but here the warranty was made with respect to the power of the pump under the peculiar circumstances and conditions which were well known to the agent at the time the warranty was given. We, therefore, conclude that it was within the apparent scope of his authority to warrant that the pump would do the work under the circumstances, and that defendant had a right to rely on the representations thus made.

While it is the ordinary rule that a party who can read and who signs a contract without reading it will not be heard to complain that the provisions of the contract are not what he supposed they were, yet this rule does not apply when the party thus signing is misled by the other party or his agent, and for this reason fails to read the contract. Defendant's president says that after agreeing on the terms of the contract plaintiff's agent handed him a paper to sign. It was then late in the evening and quite dark. The president could not see very well. The agent said that the paper was not a contract, but a mere memorandum of the sale. Hillman, who was present, corroborates the president. Plaintiff's agent at first stated that he did not remember whether the president read the paper or not, but finally stated that he did read it. The agent, though his answers are somewhat evasive, practically admits that he made a guarantee not contained in the written contract. Viewed in the light of the circumstances surrounding the transaction, and of the positive evidence of Mr. Carpenter and Mr. Hillman, together with the evasive answers of plaintiff's agent, we think the evidence sufficient to show that the pump was guaranteed to do the work for which it was purchased, and that this provision of the contract of sale was omitted from the written contract by mistake on the part of defendant and either fraud or mistake on the part of the agent representing the plaintiff.

We also conclude that the weight of the evidence is to the effect that plaintiff's agent agreed that if the pump would not do the work his company would take the

pump back. Mr. Carpenter so testified. While the agent in his testimony declined to say in terms that such an agreement was made, he admits saying that if the pump would not work, some other arrangement would have to be made. After complaint was made by the defendant that the pump would not work satisfactorily, the agent suggested that a larger pipe be used, and stated that if by the use of this pipe the pump did not work, his company would take it back. As he was the agent and made the sale, and as he was sent by his company to see if some change could not be made which would render the pump more effective, we think it was within the scope of his authority to agree that the contract should be rescinded.

Judgment affirmed.